Good morning, Your Honors. Virginia Keeney on behalf of plaintiffs, and I'd like to reserve two minutes for rebuttal. May it please the Court, I would like to focus my remarks on four issues. The first is the District Court's treatment of the ADA claims on behalf of Mr. Kahn, a quadriplegic, and the class of mobility-impaired individuals he represents. Secondly, the inappropriateness of the Court's decision to sui sponte vacate the injunction in Storphy Gate. Third, the Court's holding that as a matter of law, it could not grant injunctive relief in this case, even if it found a violation was occurring. And finally, the District Court's erroneous application of law-to-facts in reviewing the constitutional issues, the five constitutional issues presented in the Pierce case. Would you tell me what your third point is, would you? The third point is that prior to the trial of this matter, Judge Taylor ruled that he could not grant injunctive relief, because of the existence of Storphy Gate. And so I'd like to address that third point as well. I can do it now or I can wait until a little bit later. Turning first to the ADA claims, the District Court applied an incorrect legal standard in evaluating those claims. The District Court applied Gates v. Roland, which is a case which has followed the Turner analysis, in holding that any impingement on a disabled inmate's rights is acceptable, if it's reasonably related to a legitimate penological interest, and that it is the plaintiff's burden to establish that any failure to accommodate is unreasonable. And it is our position that Gates v. Roland has been or should be reconsidered, in light of Pennsylvania v. Department of Yeski and Johnson v. California, two recent Supreme Court cases addressing the correctional setting. With respect to the Yeski opinion, the Supreme Court held that the same analysis should be applied in the correctional setting in evaluating ADA claims as it does in any other institutional setting, and that there should be no reason to deviate in the treatment of correctional settings from other institutional settings. The case of Johnson v. California is also, I think, important for the Court to review and consider, because there it was a question of whether racial classifications in the California Department of Corrections were permissible. And the Court in Johnson held that the reasonably related standard should not apply whenever there is invidious discrimination. Now, defendants appellees take the position that that was a race discrimination case and so has no application here. But we would submit that Congress, in passing the ADA, explicitly used the same language to describe discrimination against individuals with disabilities, as has been developed by the Court to describe the effects of racial discrimination. And I point the Court to 42 U.S.C. section 12-101, which is the purpose of the ADA, which describes disability discrimination against individuals with disabilities as a pervasive social problem, describes them as a discreet and insular minority that has been subjected to a history of purposeful unequal treatment, relegated to political powerlessness, severely disadvantaged, all based on stereotypic assumptions. And it's our position that the Ninth Circuit, this panel, should evaluate whether or not the standard that was applied in considering the ADA violations in this case was the proper one. However, even if the Court was to apply the Turner analysis, or Gates v. Rowland, the trial court's findings were clearly erroneous in this case. The evidence was presented and was undisputed that individuals with mobility impairments are housed in the two old jail facilities, the men's and women's jail, and that they are not permitted into CO Lacey or MUSIC, which are minimum security facilities that provide programs and activities that are far more liberal than those allowed in the men's and women's central jail. And, for example, at CO Lacey, there are outdoor playing fields, there are bocce courts, there are day rooms that people have open access to, there are libraries and billiard tables in the day rooms. Each one of those is a program and activity that is being denied to individuals with mobility impairments because they're basically housed in single cell, the equivalent of maximum security cells in the old jail facilities. And I would direct the Court, and I miscited it in the appeal and I apologize, the day rooms are depicted, the day rooms that people with mobility impairments have are depicted at pages 10572-73 of the record in the women's jail and 10592-10594 in the men's. It is a 12 by 12 foot room, it has nothing in it other than one magazine and a bench. It has no place for anyone to exercise or recreate. And that is the only day room that is being provided to people with mobility impairments as compared to what is provided at CO Lacey and MUSIC. The evidence was also undisputed that the only outdoor recreation area that individuals with mobility impairment can go to is the roof. And the bathrooms and the drinking fountains and in fact everything on the roof is inaccessible to individuals with disabilities. And in the classrooms, the same is undisputed, that there is no restroom that any inmate, I'm sorry, detainee can use if they are permitted to take a class. And the Court found that it was a reasonable accommodation for the jail to say, well, we'll move people back and forth if they have to use a bathroom. And we would submit that there is no evidence in the record that supports that that actually will in fact happen. And in fact, the one most vivid part of the jail tour undertaken by plaintiff's expert and plaintiff's counsel was a tour of the men's sheltered living and hospital area where they watched, we watched as inmates tried to lift an individual in a wheelchair over the rim, a 12-foot inch rim of a shower to get into a shower and not one deputy assisted. And I think that that is a vivid description of how unrealistic it is for compliance with the ADA to rely on sheriff's deputies in a very busy jail to move people with disabilities back and forth every time they need to use the restroom. What in fact is going to happen is that people with disabilities will not elect to go to the roof or to take a class if they know they won't be able to have access to a restroom, a drinking fountain, a telephone or the other things that other inmates have. Let me ask you about a specific finding on the ADA. Yes, Your Honor. It seemed that the judge thought that with respect to maybe the barriers in the bathrooms and that sort of thing, the judge made the finding that he thought that Mr. Robertson's statements were conclusory and that there wasn't anything about, you know, cost and feasibility and alternatives. But in looking at the study, I thought that there was. So would you comment on that finding by the judge and is that referring to the bathroom and the architectural barriers and physical changes? Well, I thought that the court gave very short shrift to the ADA argument. And I did believe that in the expert's report and in his testimony, there was evidence of reasonable accommodations that could be made. Many of the access issues related to fairly minor changes. For example, the grab rails were not installed correctly in a lot of the rooms. And so those changes, I think the expert testified, could easily be made. With respect to, you know, leveling of the elevator, I don't know if there was evidence on that. Our position is that there was sufficient evidence to shift the burden to the county to explain why it was not able to make, I'm sorry, was not able to, why making these changes would cause a substantial or fundamental change to their programs. With respect to the other evidence, with respect to the treatment of individuals with disabilities, I think I've addressed the fact that there were no accessible restrooms. The other, I think, and I haven't addressed that. I apologize, Your Honor. And I think the only accommodation that was suggested by the court, again, as I said, was sheriff's deputies coming to the assistance of individuals with disabilities. And given testimony that was elicited in other parts of the trial, for example, that the sheriff's deputies are so busy that they can't give a full 15-minute lunch to all the detainees, I think that further undermines the court's finding that compliance with the ADA could be met by sheriff's deputies moving people around. Turning to, unless the court has other questions about the access issues, I wanted to address a related ADA question which stems from Mr. Kahn's request for emotional distress damages. Mr. Kahn's claim for emotional distress damages was dismissed at summary judgment when the court found that his injuries were de minimis. And we would submit that that ruling was erroneous for several reasons. First, it's our position that the Prison Litigation Reform Act should not apply in the setting of the ADA because most of the injuries that would occur under the ADA, like under the First Amendment, are not ordinarily going to result in physical injury. And that the Prison Litigation Reform Act did not intend to take away full benefits for individuals with disabilities who were seeking access to programs and the like. You're never going to have a physical injury. But you allege that you do have physical injuries here. But we do. And you have two circuits that apparently have said that the PLRA applies to the ADA and that that requirement is a constraint on ADA claims for damages. Yes. We understand that the Ninth Circuit has not ruled on this. It would be a question of first impression. We argue alternatively that even under Oliver v. Keller, which is, I believe, the Ninth Circuit's most recent statement about what is a de minimis injury, in that case the court said there doesn't have to be physical force applied to an inmate to constitute a physical injury. But it has to be more than de minimis. And it's our position that it was clearly erroneous. What is the injury and your characterization of why it wouldn't be de minimis even if we were to go under the current construct? Well, I would highlight the following points. Mr. Kahn is a quadriplegic. He has two rods in his back. He suffers from constant pain as a result of discomfort in his body. He was required to use a commode chair. It's basically a shower seat or a toilet seat on wheels for two weeks during the time that he was in the jail instead of a real wheelchair, which caused him incredible pain and discomfort. He was put in a cell for two days, which had no grab rails, and so he could not use the bathroom, which caused him bodily discomfort because he couldn't use the toilet. He soiled himself on numerous occasions because of the... of an injury that's not de minimis? I mean, this is... Obviously, this should be very disconcerting to us. I hope it's disconcerting to the prison officials, but my question is whether it rises to the level of a physical injury. Well... You had other evidence about bed sores and... Yeah, I was sort of warming up. And other things. The soiling didn't seem to rise to the level of a physical injury. It certainly was a horrible indignity. Well, he was refused an egg crate mattress, causing bed sores, and he was forced to sit on the hard bench, which opened a sore in his buttocks, which later required surgery. I believe all of this is in the evidence. And that may seem trivial, but for anyone who's worked with people who are in wheelchairs, being placed on a hard bench can cause a sore that can escalate into a physical injury that requires medical treatment, which happened in Mr Kahn's situation. He also was required to reuse catheters, which caused constant bladder infection. Counsel, that piece of evidence I think is also very disconcerting, and I guess my question is why isn't that, if you brought under, let's say, an Eighth Amendment claim, why isn't it an independent claim, if why is it an ADA claim? Why is it an ADA claim? Why is it an ADA claim as opposed to a medical matter? Why isn't this a matter of medical malpractice, for which you may either have a tort remedy or an Eighth Amendment claim against prison officials who forced him to reuse a catheter? If you had a prisoner who wasn't disabled, that for some reason had to use a catheter temporarily, and we were forcing him to use the same catheter over and over again, and it was dirty and we required an infection, I don't think we would have a prisoner coming to us with an ADA claim. Well, this is the area where I think the ADA and, you know, constitutional claims merge. I think he has both claims. The catheter is a result of the bathroom situation? Is it as a result of the physical barriers? No, Your Honor. He self-catheterizes himself, and later he had one that was, I guess, a permanent one. Later, but during the early part of his stay, he was required to reuse one, and so we're claiming that one of the accommodations he should have been given was adequate number of catheters to accommodate his physical needs. Could it have also been pled as inadequate medical care? Perhaps it wasn't, but I don't think it precludes it from being considered as a physical injury under the ADA. I'd like to move on to the decision to vacate the injunction in Stuart v. Gates. The defendants agree that they bore the burden under Rule 60B and, I believe, under the Prison Litigation Reform Act to establish that the conditions that had been enjoined previously in Stuart v. Gates had been ameliorated, and it is putting aside the whole issue of whether the trial court could have sua sponte raised this or whether it had been brought by motion. It is undisputed that there was no evidence put on  violations that were enjoined in Stuart v. Gates. Most significantly, there was no evidence put on at all by defendants that they had fixed the overcrowding problem. And indeed, in their post-trial brief and argument, they argued that the cap on overcrowding in the jail should not be lifted. Nonetheless, the judge reversed all of these aspects of Stuart v. Gates where there was no evidence presented as well as the population cap, and that exceeded the judge's authority under both Rule 60B and the Prison Litigation Reform Act. Now, the overcrowding claim in Pierce is only as to hold himself? That's right, Your Honor. Pierce had a very narrow overcrowding claim. Stuart v. Gates put a population cap on the entire prison jail population. What evidence do we have of overcrowding in the general population count? Is there anything? There's nothing. There was no evidence presented about the general population count because, frankly, we didn't believe it was up for... We didn't believe it was being litigated, and I don't think defendants seriously thought it was being litigated, and they presented no evidence. In fact, asked that the cap be maintained. Let me just interject and ask a question. Did this case go to mediation in the Ninth Circuit? It did. At least I went back over the docket and... I didn't see it in the docket. I think we did. Well, that seems unusual that you wouldn't know. Well, it didn't. Nothing happened. In other words, did... I don't want to know what was talked about, but did you have a meeting with the mediator? Yeah, it was not fruitful. Okay, that's fine. That's all I can say. We had a number... The reason I'm confused is we had also some settlement discussions with respect to Mr. Khan's individual case. Right. So there were... Whatever efforts to settle the case were attempted by the parties. They were not fruitful. It's maybe not too late. What about on the overcrowding then? For example, your survey evidence or the survey itself that was excluded, that did not relate to general overcrowding? Well, all of the issues that we raised in Pierce indirectly talked about general overcrowding. I mean, there was a lot of evidence put on about meal time. As to the... Either timing or otherwise, but about general overcrowding. Was that in the survey or was that more directed to the Pierce issues? I don't think it was in the survey. The survey asked about all sorts of things, but it didn't ask about what the overall jail population was. I mean, I can represent to the court that it is over capacity, but I don't think that's in the record. Okay. And that's our point being that the district court should not have repealed sort of the case on that issue without obtaining evidence on that issue. And it would not... Doesn't the PLRA require the court to revisit this, in particular in the case of an injunction that's more than two years old? Is there a presumption that it's to be terminated within two years unless the district court makes certain findings? I don't believe that's true if there's a pre-existing injunction that was in place before the act. I think that the law, I think, B-1 requires that if you have an injunction entered into before the PLRA that it's terminable within two years. I think, nonetheless, I think the Gilmore case indicates that there has to be evidence presented, however, by parties seeking to relieve... Once you put any part of the Stewart injunction into question, isn't the district court entitled to... and actually responsible for going back and re-examining the injunction? Well, we did not... We only put five issues at issue in the Pierce case. We did not ever seek to have the injunction, you know, reconsidered. But then when the judge decides to do it and then treats... I thought treated the government's brief as a motion, there was no objection to that procedure, is that correct? At that time. There was... We did not understand the court to be taking evidence on all of the issues. We didn't, especially when the court had told us we would have three days to put on our entire case. I think it is inconceivable how we could... and discovery was over at this point, how we would actually have put on evidence of the eight issues that no one had ever looked at in three or four years of litigation. The questions of prison overcrowding and exceeding caps should be something that would be fairly simple to verify. Did you request the judge reconsider that order? Did you ask for an opportunity to come in and present evidence afterwards? I don't believe we did, Your Honor. I don't think there was a motion for reconsideration. And with respect to the trial limit, the three-day trial limit, there was an initial objection to that? There was an objection to that. And after the... And I believe it was renewed. ...and you put on your case, was there another objection? I don't know if there was one at the close of evidence. We filed... Was there a request for more time? There was a... There was a written motion or an objection to the court imposing a three-day limit. And at the end, you didn't say, we didn't have an opportunity to present X, Y, and Z. There was nothing... At least I didn't see that in the record. I don't know if it is in the record. I couldn't cite you to it if it was. But, you know, as an example, we were never directed to put on evidence of, you know, law book access. There simply was... Now, the survey did address that. A lot of these questions were presented in the survey, which the judge excluded. And so there was no testimony ultimately received about them in the trial. And finally, I don't know if the court wants me to address the issue of the injunctive relief, but I do think this is important. The trial court made the ruling that in Pierce, it could not grant injunctive relief as a matter of law because of the existence of Stuart v. Gates, which at that... This is before it had vacated Stuart v. Gates. And the only thing that plaintiffs could seek was declaratory relief. And we would submit that a district court cannot be deprived of issuing a modification or an expansion of an injunction merely because of the existence of a pre-existing injunction. And the example I would give is this. Defendants have taken the position that Stuart v. Gates can only be read to guarantee two hours of outdoor exercise to inmates in administrative segregation, for example. And they've taken a position that, with respect to other inmates, Stuart v. Gates didn't speak at all. So people in an admin seg have more protection than all of the other detainees. So one of our positions was that the court in Pierce, had it found in our favor, could have granted injunctive relief to say that everyone in the jail should receive two hours of outdoor exercise per week or more if the court found that more was required under the Constitution or necessary... Maybe you can just clear something up for me. Is that there is a statement that because of Stuart, the judge couldn't do certain things, but then the cases are consolidated. So where did that leave...? It left the judge saying we were not seeking injunctive relief. So we tried the case for declaratory relief because the court had said it couldn't grant injunctive relief. And yet it then vacated Stuart v. Gates. The injunctive relief that it said precluded it from granting injunctive relief in Pierce. My view is if, leaving aside whether Stuart was correct or incorrect in terms of the vacation of the injunction, that in Pierce you would have put on evidence as to the injunction? Would it have been different evidence? No. So the only question would be the remedy, not the evidence? Yes. I mean, this point is important to me if the court is intending on remanding on any of these issues. Not the ADA. The ADA isn't covered by this. The ADA was... The court didn't think it was precluded from issuing injunctive relief. But if for any reason there's going to be remand on any of the constitutional issues, we don't want to go back down and have the next trial court say it can't grant injunctive relief, only declaratory relief. What we're seeking here is injunctive relief. And, you know, the district court's reasoning, I really didn't understand. It was relying on a state court decision in Cornblum in which a federal judge and jury had granted total relief against the San Diego jail system. And in that case, a state court said, full relief has been granted. There's an ongoing consent decree being worked on. And this new case is moot. But clearly our case was not moot. You know, the jail conditions 30 years after Stuart v. Gates are just different and are an ongoing issue that needed to be resolved. But once you consolidated it, why couldn't any injunctive relief that you thought you were entitled to simply be folded into the original Stuart injunction? The Stuart injunction has been revisited for a number of times over the last 30 years. I don't... Well, when we tried it, the court, and I could not point you to the record, stated several times that, you know, this is not about injunctive relief. You can't get injunctive relief here. So I think what the court understood was that he could only withdraw or cut back on Stuart v. Gates. He couldn't expand it in any way. Did you think that the judge was under a misapprehension that he didn't have the authority to modify under the Prison Reform Act? I don't know. He never indicated that he was... Well, I can't speak to that. But what's your point in that? I mean, in other words, now it's gotten even vaguer to me what it is with respect to this point you're asking us to determine. Are you asking us to direct the district court to consider injunctive relief and different from declaratory prospective relief? I think it's as simple as that. But whether it would be under Pierce or Stuart or the consolidated matter, I'm not quite sure. Who would have the burden of putting on the evidence so the judge could decide if there should be some additional prospective relief? Well, I think under the Prison Litigation Reform Act, the defendants have the burden of putting on evidence that they've cured the deficiencies in that statute. So I think the defendants had the burden of proof if they were going to vacate any aspect of Stuart v. Gates. Now, if we wanted to expand Stuart v. Gates, which, in a sense, we were seeking to do by claiming that the two-hour day room should apply to everyone in the jail, not just those in administrative segregation, we bore the burden of proof on that, and that was properly raised in the Pierce matter. So you're saying Pierce burdens on plaintiffs, Stuart burden on the defendants? I am. I mean, it's sort of a procedural conundrum. As a matter of sort of docket management, you could understand why the district court might be concerned if Stuart and Pierce were to be separated and at some future time they were to be assigned to two different district courts. Then you might have overlapping orders in which the county would be responsible for doing two different things and being responsible to two different courts. I think it doesn't seem irresponsible for a court to say, I'm not going to issue a separate set in Pierce, which is under a different docket number, when I have an injunction that seems to cover a great deal, if not nearly everything, at the county in Stuart. Once they get consolidated for purposes of trial, what's the problem? If there's something to be enjoined, why not fold it into the Stuart injunction and keep it all together? I don't disagree with your reasoning at all, Your Honor. They should be in front of one court. They should be consolidated. The oddness is that there's different versions of proof set by the statutes that the parties are operating under. Let one there from the government. Thank you. Good morning, Your Honor. My name is David Lawrence. I represent the Appalese County of Orange and Sheriff Michael Corona. Also with me today is Deputy County Counsel Stephen Miller, and we decided to divide our time. I will take the first 15 minutes, and he will take the last five. The issue he's prepared to address is the issue regarding whether or not the non-Pierce injunctive relief orders were improperly vacated. I'm happy to go through the order of issues discussed by Ms. Keene, but there are an awful lot of issues in this case, and I don't want to assume that the court necessarily wants to hear just those. So, if any of Your Honors would like me to address specific issues that have not been, I would like to do that. Well, I think we all are very interested in the ADA issues. Okay. Well, for one thing, the injuries that the counsel refers to are not injuries resulting from an ADA violation, for instance. Their ADA expert said that the elevator didn't level by half an inch. Well, wheelchair-bound inmates are taken down to the elevator, put in the elevator and taken to the roof if that's what they're doing, or they're taken down to where the classrooms are if that's what they're doing, and there's no injury from that. Really, what counsel is referring to, and it was mentioned before, is the sort of injuries they're referring to are really more appropriately brought as inadequate medical care claims. Counsel, I understand there to be at least two different kinds of ADA problems here. One is a structural problem. That is that the county has failed to comply with the affirmative mandate of the ADA to make rooms and bathrooms and all of that accessible to the disabled on an equal basis. And then I understand there to be a second set of claims, which are largely the con claims, which are claims of injuries resulting from violations of the ADA. So that's the personal injuries. That's the overlay that I was discussing with Ms. Keeney about whether the PLRA requires injuries in proof of ADA claims. But I understood the first part of the plaintiff's argument to focus on the question of inaccessibility and structural problems in the construction of the jail. Well, the sort of things that were adduced at trial were did the wheelchair-bound inmates have an accessible shower? Mr. Kahn himself admitted that he did. There was a shower in the sheltered living area. There was a shower in the day room. The shower in the day room was less accessible because of the manner in which he had to get back into his jail uniform after he took that shower. But he clearly admitted that it was. And since that time and before the judgment, the jail or the shower in the day room was made fully accessible with grab bars and everything that one might want if he or she were wheelchair-bound and wanted to take a shower. One of the first claims is really that by keeping the disabled inmates in certain facilities, it deprives them of access to programs and facilities that are much more complete. Okay. The two programs that were discussed the most were the Best Choice Program. And that's a program that was only available to sentenced inmates who were actually living at home and going to a job that had been acquired in that context. So... Okay. Counsel talked about there not being available to facilities like open playing fields, all sorts of things which were available to many of the facilities. Well, certainly the music and the theology facilities are different than the central jail. But not everybody in the central jail, either the men or women's side, have access to all of those things either. But are the disabled systematically forbidden from going to the theology? Well, it depends on what you mean by disabled. I mean, counsel have claimed that all disabled inmates are within either sheltered living or Ward C or whatever. And that's not true. It depends to the extent of the disability. A wheelchair... Is this case a wheelchair disability case? It's a wheelchair disability case and also Mr. Pierce had some difficulty with dexterity. And so the class is wheelchair-bound individuals with dexterity problems. Going back for a moment to the structural problems, the judge said that they weren't cured yet but that they were working at it diligently or that they had it in mind and had a plan. Well, it depends on what structural issue you're talking about. Well, that's what the judge said. He was not more specific than that. I understand that. And there was a whole litany of, frankly, very minor issues raised by the plaintiff's expert. And if you look at note 7 from Judge Taylor, he noted that. Frankly, I'm not sure exactly what it is he's referring to other than perhaps the addition of this mod O at one of the other facilities which would also house wheelchair-bound inmates. But does the county concede that there still have things to do? Well, countywide there are still things to do. The plan that was issued after the issuance of the ADA includes a variety of things that need to be done. Now, does each one of those actually represent a violation of the ADA? It depends. While the plaintiff's expert said the half-inch difference in the elevator is an ADA violation, there's no statute or regulation that says that. He simply said it should be this way and therefore, in his view, it was an ADA violation. So you have to consider whether or not if there's a violation or if there is a structural issue. Let me take the elevator as an example. Did the district court address the elevator? Not specifically in his written... Either by law or by fact. Either you find that it wasn't a half-inch and so there wasn't a problem or you could say a half-inch is within the level of tolerance and there's simply no ADA violation here. My recollection is that he did not, in his conclusions of fact and law, specifically address the half-inch leveling thing in the elevator. But if you look at the testimony of Mr. Roberts, the plaintiff's expert, if Judge Taylor were to address factually in his findings of fact and law, each and every point raised by Mr. Roberts would have a hundred-page opinion here because he came up with a whole litany of things that he thought should be cured in addition to claiming that... Well, let's just talk... I mean, the difficulty we have is there's got to be some happy medium between the rather cursory rejection in the order and the more detailed testimony at trial. It's pretty hard for me to figure out what he ruled on. So here's one thing he did say. He said that the initial showing falls short of the evidence to show declaratory or injunctive action. Normally, in an ADA case, like in these employment cases, you put on this primary case, and then it shifts to, in this case, the county or the jail, and then it shifts back. It's not clear to me he used that structure and analysis, so then it's kind of hard to know who falls where. Would you address that? Here's how I view that. The Ninth Circuit case law says that the plaintiff has the burden of proving, for instance, a structural problem with regard to disabled inmates and offering an accommodation. And then the burden shifts to the government to say whether or not that accommodation is reasonable, whether it's inconsistent with legitimate and penological purposes, et cetera. Appellants did not propose structural changes. They did not propose and did not put down the cost of what those would be. They really didn't provide the accommodations so that the county could say, well, we can't do that because of this. And incidentally, it was... Did they have to do more than this report that noted the problems? I'm sorry? Did the plaintiffs have a burden to do more and note the things that needed to be cured and changed? Well, absolutely. And simply because they say that they are of ADA dimension doesn't mean they are. And that was my point earlier. Mr. Robertson, who calls himself an accessologist, simply took measurements, said a grab bar should be maybe an extra six inches longer than it was, things of that nature. Well, one thing... Here's what we have is they have the barrier and then they have indicated action or alternate solution. So you've indicated they need to put forth what the structural issue is and what the alternative is and then the burden shifts as to whether you can accommodate that. Why doesn't this fairly extensive chart meet that? I'll tell you why. Because it was the position of appellants that the entire jail facility should be accessible to wheelchair-bound inmates. And we had abundant testimony, including the testimony of Captain Board, that you simply cannot co-mingle inmates like Mr. Kahn. And, in fact, Mr. Kahn testified that if he was attacked by another inmate, he could not defend himself. So the report prepared by Mr. Robertson related to the entire jail facility, which is why it's so extensive. Well, the county could have segregated and said, okay, we think that we need to accommodate X, Y, and Z and either we've done it or we're going to or we don't think we have to. The fact that the survey covers more, I don't think necessarily relieves the county of its burden. Well, the testimony that I think addresses that mostly is the offered direct testimony of Mr. Biner, who was the Sheriff Department's official in charge of making the jail ABA compliant and his cross-examination at trial. And I think he was very specific about what had been done and it related to the issues raised by Mr. Kahn, specifically the showers, roof recreation, access to programs. He pointed out that the classrooms where programs were given, you could get there through the elevator, there was no ramp required. So he did address those issues that related specifically to Mr. Kahn. One of the problems is that Mr. Robertson and the appellants went way beyond anything that Mr. Kahn had standing to raise and that's why we have so many issues there. Well, I think they claim they're representing a class of wheelchair-bound individuals that had some dexterity issues. Is that incorrect? Well, I think you could find various articulations of what they thought Mr. Kahn was the class representative for. But I think we have to look at the reality and the reality is what were the complaints raised by Mr. Kahn and those complaints were the shower, the day room, the rooftop recreation, not being allowed to be at the music or theology facility and that's about it. I have another question maybe you can help me on. I think it was maybe the third issue that the appellants council raised. That has to do with the decision to vacate Stewart. I'm happy. The defendant agrees that the defendant bears the burden to show that there's no further violations. Is that a correct statement of the view of the county? I'm sorry, are you referring to their argument that the court sui sponte vacated Stewart? Yeah, with respect to Stewart. Okay, so with respect to Stewart, her position or she claimed that your position is that you bear the burden to show that there's no ongoing violations. That's true. With respect to vacation of Stewart. With respect to vacating Stewart. And you agree with that? Yes, and Mr. Miller is more prepared to address that issue than myself. Okay. But I'd like to address it if you'd like the issue regarding the injunctive relief. On Pierce? Yes. That seemed like a very simple issue to me. Stewart was in existence. The Pierce plaintiffs filed their complaint and alleged as the constitutional violation for their 1983 claims, the Stewart orders. They were not asking to modify the Stewart orders. If they wanted to do that, they simply could have filed an application in Stewart to modify the Stewart orders. And in fact, they did that either at the beginning or shortly before the commencement of the Pierce lawsuit. So they knew how to do it. If they really wanted to modify the Stewart orders, you file an application with the court or you ask that the sheriff be held in contempt, they know how to do that. What they were trying to do was to get the same injunctions in the Pierce case that existed in Stewart. And the problems that would arise from that I think are very apparent. Why get an injunction that already exists? They, I suppose, had two routes to modify or to seek a contempt order. Either way, I suppose, in Stewart they could. I mean, they certainly, if their goal was to expand or modify the orders in Stewart, the Pierce lawsuit was not the vehicle for that. The vehicle for it was an application to modify or a contempt proceeding. So then if you have the issues, well, the issues in Pierce that don't overlap with Stewart. Right. Okay. Let me say this correctly. Then... Can I stop you for a moment? Yeah. There are no issues in Pierce that don't overlap with Stewart. There are issues in Stewart that don't overlap with Pierce. Okay. Well, that was my question. So, in your view, all of the Stewart issues actually are coextensive with... I mean, all the Pierce issues are coextensive with Stewart? Except for the ADA claims. Except for the ADA claims. Except for the ADA claims. They were verbatim the orders from Stewart. And so the plaintiffs were claiming, they were seeking monetary damages for violations of the Stewart orders. And the court said you can't get damages because there's no physical injury. Or you can't get damages because there's no physical injury and you can't get emotional distress damages. And the court allowed them to pursue nominal damages if they wanted to, but they chose not to. I'm down to about four minutes. I'd like to give Mr. Miller an opportunity to address the issue. He's anxious to do so. I'm sorry? I said I'm sure he's anxious to do so. Thank you. Thank you very much. Thank you. Thank you, Your Honors. My name's Steve Miller. I'm Deputy County Counsel for the County of Orange. I'm pleased to represent Sheriff Corona in the Stewart matter and co-counsel on the Pierce case as well on behalf of the County of Orange. I think I can, if it pleases the court, I'd like to address some of the key points I think the court is raising here and the concern about the overlap between Pierce and Stewart. We believe, of course, that the court properly ruled on the Stewart matters that they could be vacated, modified, or terminated. Let me ask you this question. Should they simply have vacated the various orders but left the not vacated Stewart v. Gates itself? Do you understand my question? The question of vacating the relief that was granted in Stewart but not vacating the opinion itself. Well, that's a novel approach, Your Honor. I'm not sure if that would be successful,  The court advised the parties early on in March of 2004. Our trial was in November of 2004. So some eight months earlier, the court advised all the parties that all of the Stewart orders would be on the table. They would be available to be reconsidered. Don't quarrel with that at all. It's just a question of the technical form of what to do at the end. Right, and I think we kind of reached that by looking at the fact that in the scheduling order of March of 2004, the court consolidated the cases for the December trial hearing for all purposes and indicated the court will receive evidence whether existing Stewart orders should be revised, updated, modified, expanded, and or vacated. The plaintiffs were on notice that if they wanted to raise any new issues or expand Stewart, they could have. And that was the purpose of putting them on notice. That was in the record at 4350 in the excerpts. Also in open court in March of 2004, Judge Taylor directly informed the parties that he wanted them to have an early trial setting conference so that no one would say, I didn't know we were going to do that at the time of trial. And that's in the supplemental excerpt of record at 14-035. If that wasn't enough, the court issued a minute order in April of 2004 plainly stating in two sentences that all of the Stewart orders would be considered at the trial hearing. And then as a matter of fact, there's further evidence in July of 2004, Judge Taylor said, it's the defendant's position that the Stewart orders all need to be vacated. That's the issue we're going to wrestle with. So I think it's abundantly clear and really beyond argument that all the Stewart orders were on the table. If anyone wanted to modify them, they could. Now, from the sheriff's standpoint, we wanted to have the Stewart orders terminated. We did request that the caps be kept because we thought there was some wisdom to keeping the caps in place. Did you put in any evidence that you were currently overpopulated? No, we didn't, Your Honor. As a matter of fact, we kind of had to wrestle with that because we understood that looking at the Prison Litigation Reform Act, really it's difficult to say that you can keep those caps unless there's some evidence of an ongoing constitutional violation. We had to admit that we didn't see that there was any constitutional violation there, and we argued at trial that we did not, and therefore it made it a little difficult. We tried to request that the court consider modifying under Rule 60, its own injunction, and looking at RUFO and the Swift cases, that the court would have a flexible standard to allow an injunctive relief to remain. But we feel that on all of the cases, all of the Stewart orders, they should have all been vacated, except we wanted to keep the caps, but we couldn't find a real... Did you put in any evidence? I mean, here's sort of the thing. The evidence I saw is more along the lines of, well, there's no more ongoing violations. We have this little laminated card, so everybody's kind of got it at the top of their head. Is it your view that you didn't need to do more than that? Well, very good, Your Honor. As a matter of fact, considering that both sides had three days total to put on their evidence, plaintiffs raised five Stewart orders. Those were met with a heavy amount of evidence that was presented. Plaintiffs presented absolutely no evidence, indicating that there was any violation of those Stewart orders. Now, I recognize it's not their burden of proof, but that's to be considered in terms of what the record was. You can stop there on that point for just a minute, just as an aside. So is it the county's position that you bear the burden of proving the need to vacate any existing injunctive orders under the PLRA? Very good point, Your Honor. I think if we look at the Gilmore case, which this court decided, in the absence of evidence of the plaintiff that there's ongoing injury, quoting from Gilmore, it says, unless plaintiffs do not contest defendants showing that there's no current and ongoing violation under 3626B3, the court must inquire into current conditions at the prison before ruling on a motion to terminate. We were looking at 3626B1A, subpart 3. This injunction had been in place more than two years, had been put in place before the passage of the Prison Litigation Reform Act, and the court decided under B1A, subpart triple I, that the order had been in effect for over two years. There was no evidence of any ongoing violation. The plaintiff raised no allegations, presented no evidence. I feel like we're going around in a circle. So let me ask you again. I read B1, little 3, which you just said. So definitely, you know, we're two years past a prior order. Right. Okay. I'm not quite sure what your position is, because you're saying in absence of evidence of the plaintiff, which sounds like it's a plaintiff's word, but then earlier in response to Judge Bivey's question, you said that the county had the burden. So I'm still a little confused under what your position is under B1 in terms of termination of prospective relief. What's your view of what, if any, burden you had or your client had? Correct. We had the burden of producing evidence that we were in compliance with Stewart.  Indicating that it is his strong expectation, a major tenant of the jail operations, that Stewart be complied with. I think that one of the best pieces of evidence is the sheriff took all the Stewart orders and put them into the policy and procedures manual for the jail, indicating that those are Stewart v. Gates orders, and trained the deputies who are brought into the jail that they are to comply with that. You see, that doesn't – you could paper the walls of the jail with a policy manual and it wouldn't answer the question, for example, whether it's overcrowded or not. It wouldn't answer the question of whether you're getting your reading material or whether you're getting phone access. So my difficulty here is trying to figure out what evidence you would need to put on, that there's no violations. And then you say that the way you do that is to say that you have the policy, but I think there's a gap there. Well, if there's a gap, it's because there was no allegation that there was any violation on these issues. The sheriff did put on evidence that these matters are all followed. There's testimony from the deputies. Does the presumption after two years of an injunction, after the PLRA, is the presumption that the injunction has to go unless there is evidence of a violation, or is the presumption that the injunction is in place until the defendant comes forward and says we're in full compliance and therefore there's no need for the injunction?  I think it's sort of someplace in between, but as a matter of fact. And where do you get that someplace in between a statute? The way I read it is, and I'm going back to the Gilmore case, but that dealt with a different section of the PLRA. And that was the only case that has really dealt with the burden of proof. In terms of what we did, we put on evidence that was concomitant with the level of interest that was being presented here. We did put on evidence from the sheriff and from the deputies, and even from the inmates themselves. We have depositions of at least ten inmates in the record that show that they were getting their steward rights. We asked them these questions about these issues that were not raised in the Pierce case, but were subject to being vacated. Let me ask this. Was it error for the district court to exclude the surveys? Well, Your Honor, to be honest, I hate to beg off of that. I don't think that it was, but that was not really my issue because it was raised in the Pierce case. I'd be glad to allow Mr. Lawrence to address that issue because it dealt with a lot of detail. I understand the court's ruling there, and I don't think that they made a mistake, but it wasn't my primary obligation. I thought in this consolidated case that it was offered for both Stewart and Pierce. Am I wrong? Well, I think the surveys were raised actually in the Pierce case as part of that litigation. It started out before the two matters were consolidated that they wanted to do surveys of the jail to find out if there were other violations going on. Then come to trial, they were offered and not excluded. Yes, they were, Your Honor. I'm not sure that's out of your bailiwick. Well, I don't think the surveys were improperly excluded because I think that they were based mostly on hearsay, on biased information from the inmate. They asked a huge number of them, and you certainly, in those types of surveys, you think you get more honest answers if you don't require the people to reveal who they are. And when you come to inmates, there's a lot of reasons not to reveal who you are. That's possibly true. However, it kind of cuts the other way, that the inmates are obviously there. They don't want to be there, and they don't particularly like their jailers. But there was no Daubert hearing on the survey, was there? And again, Your Honor, I apologize because I was not... We'll go back to the burden of proof. You say it's some kind of a hybrid situation. Explain that one to me. Well, I tend to think it's more a matter of, you know, it's on the burden of the plaintiffs to present that there are violations going on there, except if, you know, and I go back to quoting from... That's exactly the point. Since there's no issue raised about these being violated, there's no allegations raised, the sheriff put on evidence that we're complying with all of the steward orders, and since we can't really fight a negative or nothing, we're putting on evidence that we comply with all of the steward orders, and we argue that under 3626, the PLRA, the order should all be vacated. And plaintiffs brought up no evidence contrary, and I think under the Gilmore case, I'm sorry, I kind of lost my place there, but I love that Gilmore case, and I know you authored it, Your Honor, but it does say that unless the plaintiffs do not contest the defendant showing there's no current and ongoing violation, the court must inquire further. But since there was no presentation from the plaintiffs, they didn't even argue that steward orders should not be vacated that weren't involved in the Pierce case. What you're essentially saying to us is the sheriff says, we know about the steward injunction, we've advised everybody about it, we've educated them about it, and that's enough. But, well, it goes a little further than that. We say we follow it. We also had testimony from the sheriff's deputies that they follow this. I mean, I can cite to the record, we've got in the excerpt of the record at 6164, Deputy Culver, Deputy Dubski at 6168, Captain Board at supplemental excerpt of record 13177, et cetera, and 14729, that the sheriff follows Stewart v. Gates, not just that we have a policy to follow it, but that we do follow it. And unless there's some allegation raised that they have a problem, I think it factually presents a circumstance to the court, where is there a problem? And if there is an ongoing violation, that's the whole argument about whether it can be vacated or not, unless there's a showing that there's a violation. There's no showing that there's a violation of any of these steward orders. We do believe that we put on evidence. Plaintiffs argue that we didn't put on any. And some may say it wasn't a heavy amount of evidence that was presented on the other issues, but I think it's because of the fact that plaintiffs didn't raise those and didn't raise complaints about them. And lastly, I do want to point out that a number of the inmates did testify that they received their steward rights. We inquired about some of those in deposition. So that's all in the record. You know, whether we should have put on additional evidence above and beyond or gone further, it was a truncated trial. We only had three days on each side to put on our evidence, live and otherwise, canned and deposition and recorded. And so I think that we made a significant showing that the sheriff follows all of the steward orders. Thank you. Thank you. Is there anything else, Your Honors? Did you have any questions on the survey from the other? I'm okay. You're okay on the survey? We might ask the other... Why don't we just have your co-counsel come back on the survey question. Thank you very much, Your Honor. Would you tell us what the survey questions covered? Oh, questions like, were you ever denied 15 minutes to eat? Yes, no. You just said okay, so the heating one, what else? What did the survey cover? Were you ever denied two hours of day room? Day room, okay. What else? Did you receive the rooftop recreation? I've forgotten what the minimum was. Would it be fair to say the survey covered each of the topics in the Pierce case... Correct. ...that they wanted to take from the Stewart case? Correct. And only that. Did they lap over the issues under Stewart? I don't recall. But my position with those surveys is that those are anonymous declarations, not subject to cross-examination. Have you ever seen a survey where they actually turn over the identity of the survey participants? These weren't surveys. These were declarations. They call it a survey because there were 440 of them, and they gave them to an expert, and she says, well, they're not giving them 15 minutes to eat, for instance. Did you object to that testimony coming in from the expert? Yes. The expert can't come in and say, it's my opinion from having spoken with a number of people over there, that the jail is systematically denying inmates 15 minutes. You did object to that. We did. We did. And to me, I had never, and I've been practicing a long time, and I've never seen a court accept, and the court didn't accept, a declaration where you don't have the name of the person on there, and the opponent doesn't have an opportunity to cross-examine that person. For instance, if the question said, were you ever denied 15 minutes to eat, that was it. How many times was it? If they were in jail for a year, did it happen twice? If it happened twice, it's hardly accustomed of denying someone 15 minutes to eat, and that's, of course, they have to prove accustomed, because the only claim was against the county, the Monell claim. So the so-called surveys were just not only wrong in terms of not having the identity and an opportunity to cross-examine, they were so vague that you couldn't draw any real conclusions from them. And our expert, Dr. Morrison, pointed that out. That's in the record as well, his report and his testimony. Thank you. You may have two minutes for a rebuttal. Thank you. With respect to the class definition, it was broader than those confined to wheelchairs. It was everyone with a mobility impairment, as well as those with some impairment of their hands. I don't know exactly how it was defined, but at the start of trial, it was agreed that that was the class, and that it was going to broadly examine all of the ADA issues raised by Mr. Kahn and by the access report done by our expert, Mr. Robertson. So I don't think defendants can seriously claim that the only issues that were being raised were a few discrete issues. The entire inspection and barriers to access in that inspection were at issue and were litigated. Defendant, I think, is looking at the issue of programs too narrowly by just focusing on certain drug rehab programs offered at CLAC and MUSIC. We're talking about the whole minimum security sort of program that is offered there to men only. Women, I don't know how they can be accommodated at this point, because my understanding is CLAC and MUSIC are not open to women. But men with mobility impairments are not being placed there and so are being deprived of all that is offered there. With respect to the issue of what was at issue in Pierce that was not at issue in Stuart, originally the case was brought as a class action for damages, and that is something that I won't address. It's addressed in the papers, but that was both first granted and then four months later denied. But you kind of conceded that you were going to proceed not even for nominal damages in trial. Is that right? Ultimately, we concluded that we would try it to the court and not seek nominal damages because they were nominal damages. But the issue of whether or not it was an abuse of discretion for the court to deny class search for a class of individuals to receive potentially nominal damages is still before the court. The other issue at Pierce that is not addressed by Stuart v. Gates is the whole Title 15, the state court claim. All of those were new in Pierce and were not anything that existed at the time of Stuart v. Gates. In fact, Title 15 flowed from Stuart v. Gates. Were you showing, are you, did you make a claim of that being a liberty violation? I mean, what is the claim under the state law? It's a direct claim that Title 15 establishes mandatory duties, and this was their failure to comply with Title 15 is a breach of mandatory duties for which a private right of action exists. What do you argue on appeal? Where do I find that in your brief? It is in the Pierce opening brief. Is it? No, it could be in the, no, it's in the Pierce opening brief, but much of the evidence is discussed in the Stuart brief because the evidence would be the same on many of those. What do you argue on appeal that the district court did wrong in its rulings on Title 15? That it applied a, well, that its findings of fact were clearly erroneous. It found that there had been reasonable diligence in complying with Title 15, and we submit that the evidence presented on outdoor exercise and the Title 15 issues, meal exercise and religious services, that that evidence was overwhelming that they were not complying with Title 15. And finally, on the issue of the survey, I just wanted to address some of the factual questions the court asked. There was no Dobert hearing on that. The survey was not a declaration, though it was signed by the detainees, but it was created by a person who had training in creating surveys. It was administered in a scientific fashion, and it asked questions that were far more specific than defense counsel had suggested. The first question was, for example, have you ever been denied outdoor exercise? And then it tried to quantify how often has that occurred in the past various time periods, and it tried to find out how often. Did your expert get to testify as to the conclusions drawn from the survey? No. The expert who constructed the survey was excluded. That was Dr. Naderay Peratt. That's correct, but did the other expert get to testify that based on the information in the survey, he concluded A, B, C, D? The other expert, Mr. McManaman, was able to testify indirectly about everything he'd relied on. Which included the survey and the results of the survey? Indirectly, but the court was never able to look at the direct results of the survey. Right, but I guess then the question becomes, if the actual results got in, what's the harm? Well, I think the harm is that because it was coming in indirectly like that, the court did not give it the value that it deserved. The court discounted it having any real probative value because the court did not consider it as direct evidence. How could we possibly conclude that if one of your experts was able to testify as to the conclusions and that is in the record and the district court simply rejected it? How can we tell that the district court should have given it more weight than the district court actually did? That would have occurred had the district court admitted the entire survey. Well, I think in the court's own order addressing the survey, it indicates that it's giving it less weight because it considered it to be an admissible hearsay. So it was already evaluating it and giving it less weight than if it considered it directly as being scientific evidence. Did you ask for a Daubert hearing? They moved to exclude. There was a hearing on it and I don't know if we framed it as a Daubert hearing. There certainly was presentation of evidence of how the survey was constructed and the credentials of the person who constructed it. That was presented in written form. I don't know if there was an oral hearing on that. Unless there's any further questions? We appreciate the arguments from all counsel this morning. Thank you. The case of Pierce v. County of Orange is submitted.
judges: B. Fletcher, McKeown, Bybee